# In the United States Court of Appeals for the Fifth Circuit

Brenda Brenyah,
Plaintiff, Appellant

v.

Columbia Hospital Corporation of Bay Area, Individually and d/b/a
Corpus Christi Medical Center and Bay Area Healthcare Group, Ltd,
Individually and d/b/a Corpus Christi Medical Center,
Defendants, Appellees

_____

On Appeal from the United States District Court
For the Southern District of Texas, Corpus Christi Division

## BRIEF OF APPELLANT

Gay E. Gilson
State Bar No. 00784131
gegilson@gilsonlaw.com
Law Office of Gay E. Gilson
5525 S. Staples, Suite B3
Corpus Christi, TX 78411
Tel: 361-887-0552
Fax: 361-887-0554
Counsel for Plaintiff-Appellant,
Brenda Brenyah

# CERTIFICATE OF INTERESTED PERSONS

Appellant certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of the Court may evaluate possible disqualification or recusal.

1. **Plaintiff-Appellant:**

Brenda Brenyah

2. **Defendant-Appellee (Jointly referred to as CCMC)**

Columbia Hospital Corporation of Bay Area, Individually and d/b/a Corpus Christi Medical Center.

Bay Area Healthcare Group, Ltd., Individually and d/b/a Corpus Christi Medical Center.

Although not a party, these entities are affiliates of HCA Healthcare, Inc. which is a publicly traded company. There are no other Defendants in the underlying case.

3. **Counsel for Plaintiff-Appellant:**

Gay E. Gilson, Law Office of Gay E. Gilson.

4. **Counsel for Defendant-Appellee:**

Sarah B. Morton, FordHarrison LLP
Kevin S. Little, FordHarrison LLP

/s/ Gay E. Gilson
Gay E. Gilson
Counsel for Appellant Brenda Brenyah

## STATEMENT REGARDING ORAL ARGUMENT

Brenyah requests oral argument to aid in resolving this appeal involving summary judgment on employment discrimination, hostile work environment, and retaliation claims under Title VII, 42 U.S.C. § 1981, and the ADAAA. Brenyah worked in a nearly identical environment alongside Lawrence Dike at CCMC. In Dike's case, the Fifth Circuit found a question of fact for a jury regarding hostile work environment. *Dike v. Columbia Hospital*, Case No. 24-40058, argued December 6, 2024. Brenyah is the Black co-worker of Ghanian descent mentioned in the opinion who joined Dike in opposing race and national origin discrimination. *Id.* at 6. Unlike Dike, she presented comparators and asserted facts within the statute of limitations supporting claims of discrimination and retaliation. Oral argument would help clarify what constitutes discrimination considering *Muldrow v. City of St. Louis*, 144 S. Ct. 967 (2024), and *Hamilton v. Dallas Cnty.*, 79 F.4th 494 (5th Cir. 2023). It would also clarify standards for employment retaliation claims, and what the district court should consider relevant to the "totality of the circumstances" for hostile work environment claims.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ...............................ii

STATEMENT REGARDING ORAL ARGUMENT ...................... iii

TABLE OF CONTENTS ...............................................iv

TABLE OF AUTHORITIES...........................................viii

JURISDICTIONAL STATEMENT ...................................1

ISSUES PRESENTED ...................................................2

STATEMENT OF THIS CASE ......................................3

    A. STATEMENT OF THE FACTS........................................3

    B.  TRIAL COURT'S DECISION .......................................10

SUMMARY OF ARGUMENT ...................................... 11

STANDARD OF REVIEW...........................................15

ARGUMENT ................................................................16

I.    Brenyah experienced severe or pervasive
    harassment based upon race and national origin ...............16

    A.    A racially hostile work environment existed
        at CCMC for Dike…………………………………………17

    B.    The district court erred in its analysis of
        the "severe or pervasive" prong…………………………20

        1.    The district court failed to assess
            the totality of the circumstances
            including second-hand harassment………………20

2.      The district court construed the
        evidence in the light most favorable
        to the movant and ignored
        Brenyah's controverting evidence.........................24

3.      CCMC failed to take prompt remedial action
        to stop the harassment. ...................…..............24

II.    Genuine issues of material fact preclude summary
       judgment on Brenyah's race and national origin
       discrimination, and retaliation claims................................27

A. Race and national origin discrimination...........................27

B. Retaliation.................................................................29

C. Brenyah suffered discrimination and retaliation
   relevant to the terms, conditions, or privileges of
   her employment................................................................30

    1.      Demotion to Probation......................................30

    2.      Denial of Light Duty........................................33

    3.      Failure to return Brenyah to work.....................…....34

    4.      Constructive discharge..................................…........35

    5.      Denial of medical care under CCMC's health
            Health insurance and harassment and removal by
            security and police from Doctors Regional were
            unlawful discrimination....................................…......37

    6.      Additional facts supporting CCMC retaliated
            against Brenyah.............................................…........43

      7.    Brenyah was discriminated and retaliated
against by CCMC.................................................50

III. CCMC discriminated and retaliated against Brenyah
under 42 U.S.C. § 1981 while she was a patient trying
to obtain medical care under her employer's health
insurance...................................................................51

    A.   Brenyah's medical services as a patient from
CCMC were a contract for purposes of
42 U.S.C. §1981............................................52

    B.   CCMC falsely portrayed Brenyah as rude and
refusing to leave the hospital as a pretext to use
security and police to harass her.....................52

    C.   Brenyah was denied care for her injuries,
later diagnosed as disc protrusion/herniation
and ligament tear..........................................53

    D.  CCMC's harassment of Brenyah manifested itself by
causing her elevated blood pressure heart rate and a
panic attack..................................................55

    E.  Direct evidence of retaliation............................55

IV.   A reasonable jury could find that CCMC violated
Brenyah's rights under the Americans with Disabilities
Act, as amended...................................................56

    A. CCMC failed to engage in the interactive
process. and accommodate Brenyah's disabilities.................57

    B. CCMC interfered with Brenyah's medical care
for her disabilities and retaliated against her.......................60

V.    The district court erred relevant to Brenyah's objections............61

VI.  Issues the District Court Did Not Address................................63

    A.  There Is Sufficient Evidence to Raise a Genuine Dispute
       of Material Fact to Show Brenyah Exhausted
       Administrative Remedies as to her EEOC Charge...............63

    B.  Brenyah did not fail to mitigate damages........................64

    C. Bill of Costs Should be Resolved in Favor of Brenyah............65

CONCLUSION...............................................................66

CERTIFICATE OF SERVICE.........................................67

CERTIFICATE OF COMPLIANCE................................................68

# TABLE OF AUTHORITIES

**CASES**

*Abdallah v. Mesa Air Grp., Inc.,*
    83 F.4th 1006 (5th Cir. 2023) ................................. 55

*Albemarle Paper Co. v. Moody,*
    422 U.S. 405 (1975) ............................................ 74

*Adams v. Austal, U.S.A., LLC,*
    754 F.3d 1240 (11th Cir. 2014) ............................. 22

*Arguello v. Conoco, Inc.,*
    330 F.3d 355 (5th Cir. 2003) ................................. 53

*Beltran v. Univ. of Tex. Hlth,*
    837 F. Supp. 2d 635 (S.D. Tex. 2011) .................... 31

*Body By Cook, Inc. v. State Farm Mut. Auto. Ins.,*
    869 F. 3d 386 (2017) ............................................ 53

*Bostock v. Clayton* Cnty,
    590 U.S. 644 (2020) ............................................ 28

*Brown v. Kinney Shoe Corp.,*
    237 F.3d 556 (5th Cir.2001) ................................. 37

*Burlington Northern & Santa Fe Railway Co. v. White,*
    548 U.S. 53 (2006) .......................................... 29-30

*Butler v. Ysleta Indep. Sch. Dist.,*
    161 F.3d 263 (5th Cir.1998) ................................. 17

*Chaney v. Plainfield Healthcare Ctr.,*
    612 F.3d 908 (7th Cir. 2010 ................................. 27

*Cutrera v. Bd. of Supervisors of La. St. Univ.,*

429 F.3d 108 (5th Cir.2005) ................................................ 58

*Diflorio v. Kleckner*,
   No. 11-4405 (E.D. Pa.) ........................................................ 35

*Deville v. Marcantel*,
   567 F.3d 156 (5th Cir. 2009) ............................................... 25

*Dike v. Columbia Hospital*,
   Case No. 24-40058 ......................... iii, 2, 11, 16, 19, 20, 21, 27

*Dornhecker v. Malibu Grand Prix Corp.*,
   828 F.2d 307 (5th Cir. 1987) .................................... 26-27, 38

*Equal Emp't Opportunity Comm'n v. LHC Grp., Inc.*,
   773 F.3d 688 (5th Cir. 2014) ............................................... 69

*EEOC v. S.D. Wheat Growers Ass'n*
   683 F. Supp. 1302 (D.S.D. 1988) .......................................... 22

*Ellis v. Houston*,
   742 F.3d 307 (8th Cir. 2014) ............................................... 22

*Esmark Apparel, Inc. v. James*,
   10 F.3d 1156 (5th Cir. 1994). ......................................... 16, 24

*Faragher v. City of Boca Raton*,
   524 U.S. 775 (1998) ............................................................ 16

*Hamilton v. Dallas Cnty.*,
   79 F.4th 494 (5th Cir. 2023) .............................................. iii

*Harris v. Forklift Sys.*,
   510 U.S. 17 (1993) ......................................................... 16, 17

*Hawkins v. Anheuser-Busch, Inc.*,
   517 F.3d 321 (6th Cir. 2008) ............................................... 22

*Heinsohn v. Carabin & Shaw, P.C.,*
 832 F.3d 224 (5th Cir. 2016). ................................................ 15

*Jones v. Robinson Prop. Grp. L.P.,*
 427 F.3d 987 (5th Cir. 2005) ). ............................................. 53

*Jurgens v. EEOC,*
 903 F.2d 386 (5th Cir. 1990) ............................................... 37

*Lauderdale v. Texas Dept. of Criminal Justice,* ........................... 17
 512 F.3d 157 (5th Cir. 2007)

*Muldrow v. City of St. Louis,*
 144 S. Ct. 967 (2024) ........................................... iii, 28

*National Railroad Passenger Corporation v. Morgan,*
 536 U.S. 101 (2002) ........................................... 20

*Newbury v. City of Windcrest,*
 991 F.3d 672 (5th Cir. 2021) ............................................. 29

*Pennsylvania State Police v. Suders,*
 542 U.S. 129 (2004) ........................................... 27

*Pierce v. Texas Dep't of Criminal Justice,*
 37 F.3d 1146 (5th Cir. 1994) ............................................. 52

*Pollak v. Lew,*
 2013 WL 1194848 (S.D. Tex. 2013),
 aff'd, 542 F. App'x 304 (5th Cir. 2013) ................................ 52

*Price Waterhouse v. Hopkins,*
 490 U.S. 228 (1989) ........................................... 29

*Ramsey v. Henderson,*
 286 F.3d 264 (5th Cir. 2002) ............................................. 16

*Reeves v. C.H. Robinson Worldwide, Inc.*,
594 F.3d 798 (11th Cir. 2010) ............................................. 22

*Reeves v. Sanderson Plumbing*,
530 U.S. 133 (2000) ............................................................ 29

*Roe v. Cypress-Fairbanks Indep. Sch. Dist.*,
53 F.4th 334 (5th Cir. 2022) ................................................ 25

*Septimus v. Univ. of Houston*,
399 F.3d 601 (5th Cir. 2005) ............................................... 28

*Stewart v. Miss. Transp. Comm'n*,
586 F.3d 321 (5th Cir. 2009) ............................................... 24

*Tolan v. Cotton*,
572 U.S. 650 (2014) ...................................... 16, 24, 31, 34, 35

*Vaughn v. Woodforest Bank*,
665 F.3d 632 (5th Cir. 2011) .................................................. 3

*Wallace v. Methodist Hosp. Sys.*,
271 F.3d 212 (5th Cir. 2001) ............................................... 28

*Warf v. U.S. Dep't of Veterans Affs.*,
713 F.3d 874 (6th Cir. 2013). ...........................................21-22

*Watkins v. Tregre*,
997 F.3d 275 (5th Cir. 2021) ............................................... 48

*Willis v. Cleco Corp.*,
749 F.3d 314 (5th Cir. 2014) ............................................... 16

*Young v. Southwestern Sav. & Loan Ass'n*,
509 F.2d 140 (5th Cir. 1975) ............................................... 37

## Statutes

28 U.S.C. § 1291 ................................................................ 1

29 C.F.R. § 1630.2(j)(1)(ii) .......................................... 69

29 C.F.R. § 1630.2(l)(1) ............................................... 58

42 U.S.C. § 12203 ......................................................... 69

42 U.S.C. § 1981 ....................................................... 2, 16

42 U.S.C. § 12102(1) .................................................... 69

42 U.S. Code § 12112 (b) ............................................ 69

## JURISDICTIONAL STATEMENT

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 because it is an appeal of an order and final judgment that denied Brenyah's claims of race and national origin, and disability hostile work environment, discrimination, and retaliation under federal law. Brenyah timely filed her Notice of Appeal within thirty (30) days of the district court's order of March 17, 2025. ROA.3032, 2855.

# STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.  A fact issue exists about whether Lawrence Dike, who is Black, faced a racially hostile work environment at CCMC. Brenyah, also Black, worked under nearly identical conditions with Dike at CCMC. Did the district court err in granting summary judgment on Brenyah's racially hostile work environment claim?  Apposite case: *Dike v. Columbia Hospital, Case No. 24-40058*.

2.  All races have equal contract rights. Brenyah, a Black employee, sought care at CCMC under her employer's insurance. Her Hispanic supervisor denied her injuries, labeled her difficult, cited past harassment complaints, and security and police harassed her. Could a jury find CCMC liable under §1981 for discrimination and retaliation against Brenyah as a patient and employee?

3.  Title VII requires evidence of harm to a term or condition of employment. The court found no discrimination in Brenyah's demotion to probation, denial of light duty and medical care, security and police harassment and removal, failure to stop harassment and failure to return her to work—concluding constructive discharge was not justified. Did the court err?

4.  Retaliation is materially adverse if it would deter a reasonable worker from reporting discrimination. The court found no retaliation against Brenyah based upon the acts stated in 3. while facing increased scrutiny and false claims. Did the court err?

5.  Disability discrimination requires evidence of a disability, job qualification, and adverse action due to disability. Sewell knew Brenyah may have qualified for light duty but told her there was no light duty. Did the court err in granting summary judgment?

6.  Disability-based harassment affecting employment terms and not promptly addressed is actionable. CCMC denied Brenyah care for her disabilities, harassed and removed her by security and police. Could a jury find CCMC liable for interference and harassment?

# STATEMENT OF THE CASE

## A. Statement of Facts.[1]

CCMC hired Brenyah as a registered nurse on March 20, 2017, with a 90-day probation per the union contract. Brenyah is a Black female of Ghanaian descent. ROA.1560, 4585, 4931. CCMC owns hospitals Bay Area and Doctors Regional and employees may be assigned to work at either. ROA.1007-14, 1560-61. Brenyah and Lawrence Dike, a Black Nigerian certified nurse assistant, faced racism at work. Hispanic CNA Kevin Hernandez told Dike to stay 12 feet away due to his race, and Brenyah heard this about six times. ROA.1561, 4625, 4968. Dike reported this to Nurse Manager Marissa Zamora, she responded, "kill him with smiles." ROA.1561, 4625-26. Brenyah frequently heard charge nurses, who exercise management authority, say patients did not want Dike because he is Black. ROA.1561, 2298, 4953-54. CCMC honored these patient racial preferences offending Brenyah, causing extra work due to staff changes which increased risk for her patients' safety. ROA.1559-561, 1581, 4951-54.

---

[1] Facts are presented in the light most favorable to Brenyah as the summary judgment non-movant. *Vaughn v. Woodforest Bank*, 665 F.3d 632, 635 (5th Cir. 2011).

Starting April 2017, Hispanic charge nurses Monica Rivera, Angela Guerra, and CNA Hernandez mocked Brenyah and Dike's African food, holding their noses while closing the door. ROA.1561, 4955-69. Rivera claimed Black people "play the race card." ROA.1561, 4951, 4964-65, 4968, 4997. She said a nurse "wasn't Black anymore" for visiting the Philippines, and "upgraded his race" by marrying Filipino. ROA.1561-62, 1582, 4624-25, 4678, 4951, 4964-65. Director of Patient Care Services, Jason Sewell, said minorities cannot discriminate. ROA.1563, 4547, 4979-80. Co-workers mocked Brenyah's Ghanaian accent. ROA.1211, 1226, 1297, 2712, 2753. Rivera said she "has a thing for Filipinos," preferring them over Black employees. ROA.3183. These incidents occurred frequently, some almost every shift, offending Brenyah and impairing her work. ROA.1561-62, 4543-44, 4643-44, 4781, 4952, 4954-68. Brenyah reported the harassment to Zamora, who told Brenyah to "kill her [Rivera] with kindness" and the harassment continued. ROA.1562, 1607, 4543-61.

Next, Zamora subjected Brenyah to increased scrutiny, harassment, and disparate treatment, including secret documentation Brenyah learned of during litigation. ROA.1562-68, 4544-47. Some

allegations suggested threats to Brenyah's nursing license, such as false claims of patient neglect. ROA.1562, 1577, 4519, 4545-46, 5191-5201. On May 19, Dike reported to Sewell that discrimination made work "an unbearable hell." ROA.1563, 3174, 3745. The next day, Brenyah requested a meeting about unequal treatment of Black nurses. ROA.1563, 3178, 3749. Sewell defended Zamora, but agreed to investigate, noting Brenyah had no discipline record. ROA.1563, 1606, 3178, 3749, 4547. On May 28, Dike again reported racial harassment by Ailyn Alcober RN and Filipino nurses. ROA.1563, 3180, 3751. On May 31, Brenyah emailed Sewell about disparate treatment, Rivera's preference for Filipinos, and the effect on patient outcomes. ROA.1563, 3182-84, 3753-55. The discrimination investigation concluded on June 14. ROA.1563, 3188-89, 3759-60. About June 15, Zamora told Brenyah she passed probation without a discipline record. ROA.1563, 4548, 5351.

At a June 20 meeting, Sewell told Dike that Alcober telling him to "shut up" was not against policy, keeping him 12 feet away due to his culture was allowed, and if a patient refused a Black caregiver, "we make it happen." ROA.1563-64, 4638-40, (Brenyah SJ Ex. 24, 6/20/17 audio, 1:05–10). On June 21, Goodwine, the Human Resources Vice President,

drafted an investigation summary and reviewed it with Brenyah, who disputed its accuracy. ROA.1564, 3332-33, 3903-04, 4517-18, 4551, 3188-89, 3759-60, Brenyah SJ Ex. 34 (Audio). Goodwine said cliques would remain, and he praised Brenyah as a good nurse, and urged her to transfer to a higher-acuity unit. ROA.1564, 1607, 4548, Brenyah SJ Ex. 34, (Audio, 56:00–58:00). They told Brenyah she would not be allowed to transfer to care for critical patients if she was not a good nurse. ROA.4548. Brenyah declined, viewing the offer as retaliatory and likely to embolden discrimination. ROA.1564-65, 1607, 1707, Brenyah SJ Ex. 34 (Audio).

The next day, Sewell asked Goodwine about firing or extending Brenyah's probation. ROA.1565, 1575, 1579-80, 5223, 5230-31, 3203-04, 3774-75. Sewell testified he was not sure any other nurse had their probationary period extended, then said there were but he could not name them or when it occurred. ROA.5223-24, 5230. Goodwine warned it may appear retaliatory and required documentation of similar treatment, which Sewell later admitted he lacked. ROA.1580, 5259. Goodwine suspected Brenyah was planning an EEOC claim with a co-worker. ROA.1565, 3203-04, 3774-75. On June 29, Sewell demoted

Brenyah to probation without explanation for why he—not her supervisor—made the decision. ROA.1565, 1579-80, 5242. Other nurses were treated more favorably: Martinez passed probation despite his patient falling and hitting their head without coaching; Terell-Christi passed with 10 coachings; and Casas and Martinez were not demoted to probation for time issues, unlike Brenyah, who handled high-risk patients without support, taking her more time to care for them. ROA.1562–66, 4549-51, 3088, 3206-11, 5226, 5242, 3220, 3226-45, 3257-59.

On July 4, Brenyah emailed Sewell and Goodwine criticizing the biased investigation, citing favoritism toward Hispanic nurses, and distortion of her claims. ROA.1566, 4550, 3192-94, 3763-65. She noted a transfer would not fix the problems, and suddenly unsubstantiated negative entries were placed in her file. *Id.* On July 7, Goodwine confirmed Brenyah had no discipline in her record. ROA.1567, 3191-92, 3763-64. On August 1, Chief Operating Officer McDonald noted Ethics complaints from Dike and Brenyah about worsening conditions in response to the discrimination complaints. ROA.1567, 4651-52. On August 10, Sewell disciplined Brenyah allegedly for rudeness without

explaining how she was rude and on a day that she did not work, while Tyrell Christie, who did work on that date and had a complaint for rudeness from the same patient was not disciplined. ROA.1567–68, 1582, 1610, 3264-65, 3835-36, 4551.

On August 23, Brenyah told Sewell she was injured in a car accident and later texted that her physical therapy was moved to HCA per her employment health insurance. ROA.1568, 4552, 5402-07. Bay Area and Doctors Regional are HCA affiliates. ROA.1008-14, 1560-61. On August 25, pursuant to instructions from HCA benefits, Brenyah sought care at Doctors Regional before Hurricane Harvey, but received no treatment for her injuries. ROA.1569-72, 3478-3507, 4049-78, 4552-59.

During the hospital visit, Brenyah endured harassment by, Josefa Espinoza, Hispanic, who was Brenyah's supervisor at Bay Area and Doctors Regional, and security and police, she had a panic attack, was discharged with high blood pressure (176/90) and heart rate, and was escorted out by security and police—unlike anyone else. ROA.1569-71, 4060-78, 1836, 4552-59, 5448-62, Brenyah SJ Exhibits 53-67 (Video), 5718-33, CCMC SJ Exhibits A-O (Video), 5478, 5492, Brenyah SJ Ex. 69 (Audio), 5494, Brenyah SJ Ex. 71 (Audio), 5496-5505, 5607-20, 5531,

Brenyah SJ Ex.75 (Audio), 5533-44. Espinoza told Joy Conda, Vice President of Quality, "she is familiar with Brenda and Brenda has used the "harassment" word in other situations." ROA.1569-70, 1738, 5515. Two weeks later, Brenyah was diagnosed with a disc herniation and ligament tear. ROA.1572, 3540-41, 4111-12.

Brenyah wrote Sewell and Kathy Rubano, Chief Nursing Officer, about what occurred at Doctors Regional and asked to meet with them about her coming back to the hospital to work because "she feared for her life as a black girl when the police were unjustly called""I do not want to come back to work to face worse ordeal." ROA.1572, 5546. Neither responded to Brenyah. ROA.4559. From November 26, 2017 to January 7, 2018, Brenyah was released to light duty but received no work, accommodation or pay. ROA.1572, 1619-20, 2490, 4560-61, 5586. Sewell testified Brenyah might have qualified for light duty but never asked about her restrictions. ROA. 1620, 2285, 4561, 5245.

On December 5, Brenyah asked Goodwine to stop Sewell's retaliation. ROA.1572, 4130-31. She filed an EEOC charge on December 22, citing race, national origin, disability discrimination, and retaliation. ROA.1572-73, 2492-98, 5606-12. Brenyah addressed the discrimination

and retaliation issues with Sewell, CNO, COO, Corporate Ethics, and the union. ROA.5216, 5546-47, 5582, 5584. The issue became a grievance which was dismissed, and management mocked her as "a nut" and that she sees herself as a victim ROA.1572, 2454, 4230-31, 5549-52. CCMC's inaction and Brenyah's risk of physical, mental, patient and professional harm required her constructive discharge. ROA.1573, 5643-44. She was replaced by Sheila Collado, a Filipino nurse. ROA.1577-78, 2531, 5226-27. Brenyah filed an EEOC charge to include her constructive discharge and other acts. ROA.1573, 5643-44.

**B. Trial Court's Decision.**

On June 30, 2023, CCMC moved for summary judgment. ROA.1208. Brenyah responded on July 28. ROA.1559. The parties were granted leave to file replies and sur-replies. Exhibits were re-filed to correct order. ROA.2700-01. The motion was referred to a magistrate on June 27, 2024, who issued a 76-page recommendation that summary judgment be granted on October 7, 2024. ROA.2709-10. Brenyah's motion to exceed the 25-page limit was denied, but she timely objected, citing omitted evidence, factual disputes, legal errors, and unraised claims. ROA.2787-93, 2795-2820. On January 29, 2025, Brenyah notified the

district court of *Dike, Case* No. 24-40058. ROA.2848. On March 17, 2025, the district court adopted the magistrate's recommendations and granted summary judgment, finding insufficient evidence. ROA.2855. Brenyah appealed on April 8, 2025. ROA.3032.

## SUMMARY OF THE ARGUMENT

The key issue in discrimination and retaliation cases is whether there is sufficient evidence that unlawful bias drove an employment action. In the present case, the district court ignored the totality of the circumstances, strayed from the law, and wrongly construed evidence against Brenyah denying the gravitas of her claims.

First, the district court erred by not considering the totality of the circumstances of Brenyah's hostile work environment claims under Title VII and §1981. As in *Dike*, where the Fifth Circuit found a fact issue, Brenyah faced acceptance of race-based assignments and slurs, accent ridicule, derogatory comments about African food, racial distancing, management inaction, false accusations, poor investigations, and staff hostility. *Dike, Case No. 24-40058*, p. 12-13. The district court wrongly excluded second-hand harassment Brenyah witnessed, like the order for Dike to stay 12 feet from Hernandez, and

ignored the cumulative impact of her experiences. A reasonable jury could find a hostile work environment under Title VII, as in *Dike*. *Id*. This also applies to Brenyah's §1981 claims.

Second, the court misapplied the law by requiring Brenyah to show significant harm, rather than some harm to a term or condition of employment for her discrimination claims. In assessing Brenyah's retaliation claims, the court erred by dismissing acts as not "materially adverse," ignoring the broader standard that includes anything likely to deter protected activity.

The district court erred by accepting CCMC's version of events despite factual disputes. For instance, the district court wrongly found no pretext in Brenyah's probation demotion, by ignoring that her nurse manager said she passed probation ten days before Sewell demoted Brenyah back on probation. At this time, according to the Collective Bargaining Agreement, Brenyah was a non-probationary nurse. Also, Sewell—who was not responsible for signing off on probation—offered no reason why *he* made the decision to demote Brenyah to probation one day after meeting with her to review the discrimination investigation. Brenyah denied receiving time-management coaching. She was

regularly assigned the toughest patients without support, requiring additional time. Sewell and Goodwine pushed Brenyah to transfer to a *higher-acuity* unit because she was a good nurse, then Sewell sought termination or probation for Brenyah the next day—an inconsistency the court ignored. Sewell admitted he lacked proof others were treated similarly relevant to probation even when simultaneously advised to document this by HR VP Goodwine.

The district court disregarded Supreme Court precedent by dismissing actionable discrimination and retaliation calling it "outside the workplace." However, these acts affected the terms and privileges of Brenyah's employment making them actionable. This included health insurance Brenyah received from CCMC by virtue of her employment where she may be assigned to work at either Bay Area or Doctors Regional. The district court also ignored Supreme Court precedent that, "An employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." Brenyah went to Doctor's Regional under her employer's insurance to seek care for injuries before Hurricane Harvey – connecting work and patient status. She was targeted by her

manager, Espinoza, who discussed her employee harassment complaints and used security and police to harass her. Sewell threatened to discipline Brenyah for trumped-up conduct during the visit. Also, Brenyah suffered offensive acts such as no medical care for her injuries, later diagnosed as disc protrusion/herniation and ligament tear, being released despite dangerously high blood pressure and heart rate, and being harassed and escorted out by security and police based upon false allegations unlike any other person in the hospital. The district court disregarded CCMC's dual role as employer, and healthcare provider, to accomplish unlawful discrimination and retaliation.

CCMC's failure to preserve the discrimination investigation undermines their integrity, shows malicious intent and raises jury issues, especially since Goodwine allegedly interviewed a witness after the investigation closed and he wrote his summary, did not interview all witnesses he claimed to and audio tapes support Brenyah's claims of discrimination. The district court did not consider the inaction by CCMC to stop the harassment, the threat of retaliation to Brenyah's nursing license and her patient safety leading to constructive discharge.

Third, the district court wrongly rejected evidence of disability

discrimination, harassment, interference, and retaliation by CCMC, including its disregard of Brenyah's serious injuries, use of security and police to harass her while she sought medical care for her disabilities under her employer's health insurance—causing anxiety and high blood pressure—and Sewell's admission that he did not assess her for light duty. This evidence supports a jury question on discrimination, harassment, retaliation, and interference under the ADAAA.

A reasonable jury could find evidence of race, national origin, and disability discrimination, harassment, and retaliation to support a verdict in Brenyah's favor. The district court's decision should be reversed and the case remanded for a jury trial.

## STANDARD OF REVIEW

The Fifth Circuit reviews grant of summary judgment de novo. *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 234 (5th Cir. 2016). It is proper only when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Courts must: (1) give credence to the evidence favoring nonmovant, (2) draw all reasonable inferences in their favor, (3) disregard evidence favorable to movant that the jury is not required to believe, and (4) not

weigh the evidence. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014). A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Esmark Apparel, Inc. v. James*, 10 F.3d 1156, 1163 (5th Cir. 1994).

## ARGUMENT

### I. Brenyah experienced severe or pervasive harassment based upon race and national origin.

To prove a hostile work environment, a plaintiff must show: (1) protected status; (2) unwelcome race or national origin-based harassment; (3) harassment severe or pervasive enough to affect employment; and (4) employer inaction despite knowledge of harassment. *Dike, Case No. 24-40058*, p. 11, citing *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002). Whether the employer's response was adequate is fact-specific. *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993). Liability depends on the harasser's status, with negligence as the baseline. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). Title VII and §1981 use the same legal anaylsis. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014).

Hostile work environment claims are evaluated based on the totality of the circumstances, including frequency, severity, threats,

humiliation, impact on performance, and workplace disruption. *Harris*, 510 U.S. at 23; *Butler v. Ysleta Indep. Sch. Dist.,* 161 F.3d 263, 270 (5th Cir.1998). A single severe act may suffice, or repeated lesser acts may be pervasive. The more frequent the conduct, the less severity is required. *Lauderdale v. Texas Dept. of Criminal Justice*, 512 F.3d 157, 163 (5th Cir. 2007)(citation omitted).

## A. A racially hostile work environment existed at CCMC for Dike.

This case is unusual because Brenyah's co-worker, Dike, filed a similar suit where the Fifth Circuit found nearly identical hostile work environment evidence raised a jury question. *Dike, Case No. 24-40058*.

Like Dike, Brenyah frequently endured the effects of: (1) race-based assignments, ROA.1559-61, 1563-64 4625, 4953-54 4968, 4638-40, (Brenyah SJ Ex. 24, 6/20/17 audio, 1:06–08), 1581, 4951-54; (2) CCMC's tolerance of racial slurs, ROA.1561, 1564, 1568 1584, 1688-89, 1724, 2011-12, 4544, 4629-30, 4665, 4953-54; (3) Hernandez's racially motivated distancing demand, ROA.1561, 4625-6, 4968; (4) derogatory comments about African food, ROA.1561, 4955-69; (5) frequent statements like, "wasn't Black anymore" for visiting the Philippines, and "upgraded his race" by marrying Filipino, Rivera said she "has a thing

for Filipinos," preferring them over Black employees. ROA.1561-62, 1582, 3183, 4624-25, 4678, 4951, 4964-65; (6) accent mockery, ROA.1211, 1226, 1297, 2712, 2753; (7) Zamora's inaction, ROA.1559-61, 1581, 2298, 4544, 4625-26, 4951-54; (8) false accusations of rudeness, including to a patient and during a hospital visit where she was denied care, harassed and escorted out by security and police, ROA.1567–71, 1582, 1610, 3264-65, 3835-36, 4060-78, 4551-59, 5448-62, 5492, 5494, 5496-5505, 5531, 5533-44, 5602, 5607-20, 5718-33, Brenyah SJ Video Exhibits 53-67, Brenyah SJ Ex. 69 (Audio), Brenyah SJ Ex. 71, (Audio), CCMC SJ Video Exhibits A-O; (9) a false claim that Dike struck a patient and threw papers at a co-workers, ROA.4634-35, 4638; (10) CCMC's policy honoring patient racial preferences, ROA.1559-561, 1581, 4951-54; (11) poor responses to discrimination complaints, ROA.1562, 1607, 4543-61; and (12) hostile coworkers, *Id.*

Brenyah also endured (13) management calling her a "nut" and claiming she plays the victim, ROA.1572, 4230-31, 5549-52; (14) secret documentation used against her, ROA.1562-68, 4544-47; (15) An unwarranted demotion to probation by Sewell—who was not responsible to make that decision—despite Brenyah's supervisor confirming she

successfully completed her 90-day probation period under the Collective Bargaining Agreement just 10 days earlier, ROA.1565, 1575, 1579-80, 5223-24, 5229-31, 3203-04, 3774-75; (16) Director of Patient Care Services Jason Sewell said minorities cannot discriminate. ROA.1563, (18) Sewell and Zamora permitted Brenyah's co-workers to jeopardize Brenyah's patient safety by tampering with her patients' medications and allowing a CNA to use razor blades on patients with bleeding disorders without Brenyah's knowledge. ROA.1566, 4559, 4659, 4687, 4689, 5249; and (19) assigning patients to Brenyah that belonged in ICU that could not receive appropriate care in her unit. ROA.1579, 1604, 4545. These incidents occurred frequently, almost every shift, which offended and impaired Brenyah's work. ROA.1561-62, 4543-44, 4643-44, 4781, 4952, 4954-68.

Brenyah's case presents nearly identical hostile work environment evidence as *Dike,* supporting a jury question about whether the facts constituted a hostile work environment. *Dike, Case No. 24-40058,* p. 12-17.

**B.** **The district court erred in its analysis of the "severe or pervasive" prong.**

   **1. The district court failed to assess the totality of the circumstances including second-hand harassment.**

The district court erred in finding no severe or pervasive harassment affecting a term or condition of employment by failing to consider the totality of circumstances, including second-hand harassment. ROA.2688, 2818, 2850, 2853, 2860. The district court disregarded the cumulative effects of the ongoing harassment and relevant facts, parsed events in isolation, downplayed frequent racist comments as merely offensive utterances, and ignored CCMC's inaction. *See National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101, 115 (2002); *Dike*, Case No. 24-40058, p. 14, ROA.2774–75, 2885.

The district court wrongly found no evidence that racist remarks affected Brenyah's performance. ROA.2775. In fact, Brenyah questioned how she could function under such conditions, and the frequent harassment impaired her work. ROA.1561–62, 1608, 4543, 4549. She described how Hernandez's slurs, the 12-foot rule with Dike, and Zamora's racial preference policy disrupted teamwork, endangered her patients, and made her feel "less than human." ROA.1603, 4543–44.

The district court ignored evidence of the harassment's impact on Brenyah's mental health, including her counseling records showing fear, distress, and job searches *before* her constructive discharge. ROA.1592, 4181–82 ("she feels traumatized"), 4185 ("really scared" "I don't know the lengths they will go to").

The district court erred in discounting Brenyah's hostile work environment claim by comparing it to Dike's, noting she wasn't personally subject to the twelve-foot rule. ROA.2860. Yet the court admitted Brenyah heard the rule enforced against Dike about six times. ROA.2753. As the Fifth Circuit found, second-hand harassment is part of the totality of circumstances. *Dike*, No. 24-40058, at 14. The court improperly relied on CCMC's facts, violating summary judgment standards. *Tolan*, 572 U.S. at 651; ROA.2775 citing to CCMC's Motion for Summary Judgment ("*See, e.g.,* D.E. 104-7 at 98-99, 101, 115, 119").

The EEOC recognizes that harassment can affect an employee's work environment even if not directed at them, though direct impact carries more weight. EEOC*, Enforcement Guidance on Harassment in the Workplace* §III(C)(2)(a) (Apr. 29, 2024).[2] Citing *Warf v. U.S. Dep't of*

---

[2] https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-

*Veterans Affs.*, 713 F.3d 874, 878 (6th Cir. 2013). Courts have found that offensive conduct toward others in the same protected class can support a hostile work environment if the plaintiff was aware of it and it affected their workplace. *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 811 (11th Cir. 2010), *Ellis v. Houston*, 742 F.3d 307, 320 (8th Cir. 2014); *Adams v. Austal, U.S.A., LLC*, 754 F.3d 1240, 1257 (11th Cir. 2014); *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (6th Cir. 2008).

Further, the district court erred in finding the August 2017 Doctors Regional incident irrelevant, incorrectly holding it did not affect a term of employment. ROA.2775. Health benefits are a term of employment even extending post-employment. *Newport News Shipbuilding v. EEOC*, 462 U.S. 669, 682 (1983). For example, in *EEOC v. S.D. Wheat Growers Ass'n*, 683 F. Supp. 1302, 1304–05 (D.S.D. 1988), the court found "[T]hough Jungers had been discharged, the conversion policy was offered as a result of his employee status, and any discrimination resulting from the policy is an unlawful employment practice."

CCMC used its dual role as employer and provider to discriminate and retaliate against Brenyah. relevant to the employee benefit of health

---

workplace

coverage through HCA who also provided medical care through its affiliate hospital system. When Brenyah sought care at Doctors Regional, CCMC falsely accused her of being rude, unruly, disorderly, aggressive unprofessional, and causing a disturbance. ROA.4080-93. However Quality VP Conda, an African-American, did not make such accusations. ROA.1738, 4088, 4679. Espinoza falsely accused Brenyah of, "lack of respect and consideration when being addressed by administration and management." ROA.4093. Espinoza also falsely claimed, "As an employee of HCA she was demonstrating unprofessional, aggressive and disruptive behavior." *Id.* Sewell wrote, "I am going to issue her disciplinary action as a result of this." ROA.3509. This statement is relevant to Sewell's state of mind regarding Brenyah even though it was ultimately not issued because CCMC did not place Brenyah back on the schedule and address her discrimination and retaliation reports. The allegations were not true. ROA.3490-3507, 4095-4106, 4552-59, Brenyah SJ Ex.53-67 (Videos), Brenyah SJ Ex. 69 (Audio), Brenyah SJ Ex. 71 (Audio), Brenyah SJ Ex. 75 (Audio, 2:45-end), CCMC SJ Exhibits A-O (Video).

The court improperly assessed each act in isolation and wrongly found none sufficiently severe or pervasive to defeat summary judgment.

As well, the district court ignored Supreme Court precedent which makes all the acts to which Brenyah was subjected unlawful under Title VII and § 1981. The court erred by failing to understand the seriousness of the offenses to which Brenyah had been personally, continually subjected. The court also omitted second-hand harassment to determine the totality of the circumstances.

### 2. The district court failed to assess the totality of the circumstances including second-hand harassment.

The district court relied on CCMC's facts without addressing Brenyah's evidence. ROA.2769–72, 2775–76, 2775, 2779, 2781 (Citing to CCMC's evidence "104"). By failing to explain why it rejected Brenyah's evidence and taking the evidence in the light most favorable to CCMC, the court violated Supreme Court's requirements for summary judgment. *Tolan* 572 U.S. at 651. This is abuse of discretion. *Esmark Apparel,* 10 F.3d at 1163.

### 3. CCMC failed to take prompt remedial action to stop the harassment.

Remedial action must be reasonably calculated to stop harassment. *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 329 (5th Cir. 2009). The district court did not reach this prong, having found no unlawful conduct.

ROA.2858-60. Although CCMC claims it promptly investigated Brenyah and Dike's complaints, a jury could find otherwise based on: (1) conflicting testimony from Sewell and Goodwine; (2) the investigation and interview note files are missing, ROA.1600, 4540, 5293, 5308-10 (3) a written summary of the discrimination investigation was drafted a week after the investigation concluded, ROA. 1563,1583, 1607, 3188-89, 3759-60, 4548; (4) the summary states Rivera was interviewed on a future date in July, ROA.3188, 3759; (5) contrary to Goodwine's claim he interviewed all Black 3West employees, Tyrell Christie was not, *Id.*; (6) Dike and Cummins contradicted Goodwine's denial of corroboration of discrimination, *Id.*, Brenyah SJ Ex. 32 (Audio); (7) Brenyah and Dike were not allowed to review or sign their statements, contrary to Goodwine's usual practice, ROA.1711, 2308, and (8) no witness summaries were created, contrary to Goodwine's usual practice, *Id.*

On summary judgment, the Court cannot assume Goodwine or Sewell are credible. *Tolan*, 572 U.S. at 651. CCMC fails its burden if a jury could disbelieve its account. *See Roe v. Cypress-Fairbanks Indep. Sch. Dist.,* 53 F.4th 334, 345 (5th Cir. 2022) citing *Deville v. Marcantel,* 567 F.3d 156, 165 (5th Cir. 2009)("Summary judgment

improper when key witness credibility is in doubt and the factfinder could view their testimony skeptically" (citation omitted)). The record also supports spoliation of evidence related to the investigation, favoring Brenyah which is addressed *infra*. ROA.1560, 1583–84, 2720-23.

Another example of CCMC's failure to take proper action to stop harassment is to characterize offensive statements and actions as jokes. For example, CCMC admitted to the EEOC that Rivera said in jest, "because you go to the Philippines all the time you're not even black anymore." ROA.1737. Brenyah did not find any of these comments as jokes and was highly offended. ROA.1603. She was also offended that no action was taken to stop them and they affected her ability to work. *Id.*

Brenyah reported discrimination, harassment and her removal by security and police to Sewell and Rubano, but received no response. ROA.1620, 4559-60, 5643. Only after management ignored her pleas for a lawful working environment, Brenyah was forced into constructive discharge because the environment threatened her health and safety, her patients' safety, and her nursing license. ROA.1607, 2526-27, 4561, 5643-44. Inaction defeats CCMC's affirmative defense, and under Fifth Circuit law, Brenyah's constructive discharge was reasonable. *See Dornhecker*

*v. Malibu Grand Prix Corp.*, 828 F.2d 307, 308–09 (5th Cir. 1987).

CCMC claimed its race-based assignments protected Dike, ROA.1211. However, *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 912–15 (7th Cir. 2010), rejected similar logic, holding that deferring to racial preferences engenders a racially charged hostility. The Fifth Circuit agreed in the *Dike* case. *Dike, Case No. 24-40058,* p. 16-17. In Brenyah's case, the remarks were not "second-hand" since the policy increased *her* workload, *her* patient safety was endangered and exposed *her* to repeated racially charged offensive comments and actions.

A reasonable jury may find CCMC's investigation inadequate, short of prompt remedial action. The defense also fails because no affirmative defense is available when the supervisor's harassment culminates in a tangible employment action including constructive discharge. *Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004).

## II. Genuine issues of material fact preclude summary judgment on Brenyah's race and national origin discrimination, and retaliation claims.

### A. Race and national origin discrimination.

To prove discrimination, a plaintiff may show: (1) membership in a protected class; (2) qualification for the position; (3) an adverse

employment action; and (4) replacement by someone outside the class or better treatment of similarly situated others. *Septimus v. Univ. of Houston*, 399 F.3d 601, 609 (5th Cir. 2005). The employer must then offer a legitimate reason for the action, and the plaintiff must prove it was a pretext for discrimination. *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). Brenyah is not required to rely on comparator evidence to prove discrimination—it is just one method. The "precise requirements of a prima facie case can vary depending on the context and were "never intended to be rigid, mechanized, or ritualistic." *Ames v. Ohio Dept. of Youth Servs.* (2025) (citations omitted). A plaintiff must present enough evidence to raise an inference of discrimination. *Trans World Airlines v. Thurston*, 469 U.S. 111, 121 (1985) (citation omitted).

Title VII requires some harm to a term or condition of employment, but not "significant" or "substantial" harm. *Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024). The statute bars treatment that "injures" employees. *Id.* (citing *Bostock v. Clayton* Cnty, 590 U.S. 644 (2020). The "some-harm" standard is a low bar. *Id.* (Kavanaugh, J., concurring). Under Title VII, an employee need not prove that the injury would not have occurred "but for" the discriminatory act. It is enough to show

discrimination was a motivating factor, even if other lawful reasons also played a role. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 229 (1989). To show pretext, a plaintiff must provide substantial evidence the employer's stated reason is false. *See Reeves v. Sanderson Plumbing*, 530 U.S. 133, 143 (2000). If pretext is shown along with a prima facie case, it can support an inference of discrimination without further proof. *Id* at 147–48.

### B. Retaliation.

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge…under this subchapter." 42 U.S.C. §2000e–3(a). To prove retaliation, a claimant must show: (1) participation in protected activity, (2) an adverse employment action, and (3) a causal link between the two. *Newbury v. City of Windcrest*, 991 F.3d 672, 678 (5th Cir. 2021). The burden-shifting framework of the *McDonnell Douglas* test applies. *Id.*

Retaliation requires a "materially adverse" action that could deter a reasonable worker from engaging in protected activity. *Burlington*

*Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 67-69 (2006).

The standard is context-specific and not limited to workplace harms or ultimate employment actions. *Id.* EEOC, *Enforcement Guidance on Retaliation and Related Issues*, §II(B)(2) (Aug. 25, 20216)[3] lists examples of adverse actions, including false reports to authorities, unjustified scrutiny, abusive behavior, or blocking access to grievance or remedial processes – all of which occurred to Brenyah.

### C. Brenyah suffered discrimination and retaliation relevant to the terms, conditions, or privileges of her employment.

The claims Brenyah brings are actionable under both discrimination and retaliation, and it is for a jury to determine if the evidence meets the benchmark for each.

#### 1. Demotion to Probation.

Under *Muldrow*, Brenyah's demotion to probation qualifies as an adverse action, as the district court acknowledged. ROA.2770. *Muldrow v. City of St. Louis*, 601 U.S. 346, 354-55 (2024). Because of demotion to probation, Brenyah faced non-selection, layoff, or termination without

---

[3] https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace#_Toc164808009

cause even if compliant. ROA.1565, 1644, 1649, 4585, 4590. See *Tolbert v. Smith*, 790 F.3d 427 (2nd Cir. 2015)( (probation was adverse due to at-will termination risk).

The district court wrongly accepted CCMC's claim that Brenyah was placed on probation for time management issues, and ignored evidence of pretext. *Tolan*, 572 U.S. at 651; ROA.2770–71. The court dismissed comparators Casas and Martinez as dissimilar and rejected evidence showing they were treated more favorably. Brenyah presented evidence she was intentionally assigned a heavy, unsupported workload of high-acuity patients which was motivated by discrimination and retaliation. ROA.1566, 1579, 1604, 1608–10, 4549–51.

Brenyah showed she was demoted to probation under unequal standards compared to non-Black RNs and those without discrimination reports. *See Beltran v. Univ. of Tex. Hlth*, 837 F. Supp. 2d 635, 641 (S.D. Tex. 2011), ROA.1562–66, 4549-51, 3088, 3206-11, 5226, 5242, 3220, 3226-45, 3257-59. The district court ignored evidence that Brenyah never received a time management plan and did not receive coaching on this issue. Further, CCMC produced conflicting same-day documents alleging such a plan, neither of which were signed by Brenyah to show her receipt

of such important information. ROA.1579, 1604, 1608-10, 3174-75, 4131, 4549-51 Brenyah testified she was never informed of serious time issues, was assigned high-acuity patients without support, and was set up to fail under unreasonable expectations, "I was expected to perform within unreasonable time constraints." ROA.1562, 1556, 1604, 4131,4545. She also reported other nurses' medication errors affecting her patients' safety and additional work for Brenyah, but Sewell took no action. ROA.1610, 4551, Ex. 43 (Audio).

About June 15, Zamora told Brenyah she passed probation without a discipline record. ROA.1563, 1608, 3288, 4548-49, 5351. In the document wherein Sewell demoted Brenyah to probationary status dated June 29, Brenyah noted that her manager already told her that her performance was good and she met her 90-day probationary period. ROA.3288. According to the Collective Bargaining Agreement, Brenyah's 90 day probationary period ended on June 18, 2017. ROA.1560, 1563, 1580, 1587, 1607, 1649, 3203-04, 3774-75, 4548, 4590, 4585, 4931. Goodwine, with Sewell present, offered Brenyah a transfer to a higher-acuity unit, which she declined, fearing it was retaliatory and would encourage discrimination. ROA.1564-6, 1607, 3203, 3774, 4548. Brenyah

would not have received the offer to transfer to a higher-acuity unit unless she was a good nurse. ROA.1564, 1607, 4548, Brenyah SJ Ex. 34, (Audio, 56:00–58:00).

The day after the meeting to discuss the findings of the discrimination investigation with Brenyah, Sewell asked Goodwine if he could terminate her or place her back on probation. ROA.1580, 1587, 3203-04, 3774-75, 5259. Goodwine warned Sewell that he needed documentation of similar treatment of other employees. *Id*. Sewell later admitted he lacked this documentation, and he did not know why *he,* instead of her manager, decided to demote Brenyah to probation. *Id*. At this point, Brenyah had achieved a non-probationary status. The temporal proximity and lack of substance of these actions strongly support pretext leaving a question of fact for a jury.

## 2. Denial of Light Duty.

Sewell testified Brenyah might have qualified for light duty but did not ask about her restrictions and, told her they did not have light duty. ROA. 1620, 2285, 4561, 5245. Goodwine claimed light duty was only for work injuries. ROA.2325, 5297. Sewell's testimony contradicted Goodwine's testimony, thus creating a fact issue for a jury.

Brenyah was cleared for light duty from November 26, 2017, to January 7, 2018, but received no assignment or pay. ROA. 5586, 5588-5602. Tyrell Christie told Brenyah a pregnant nurse was granted light duty, contradicting Goodwine. ROA.1592, 1597, 1620, 5680. Brenyah incorporates her ADAAA argument *infra* to support her argument that light duty was required under those standards. It also creates a jury question on whether Brenyah was denied light duty due to race or national origin.

### 3.    Failure to return Brenyah to work.

The district court found no genuine issue of material fact on Brenyah's discrimination and retaliation claim regarding her non-return to work. ROA.2769. The district court relied on evidence presented by CCMC relevant to Brenyah's return to work from early January to mid-March 2018. ROA.2769 (citing D.E. 104-30, D.E. 104-32, D.E. 104-33, D.E. 104-34, D.E. 104-35, D.E. 104-37, D.E. 140-93). By ignoring Brenyah's controverting evidence and giving credence  to evidence submitted by the movant, the district court violated the axioms of summary judgment. *Tolan,* 572 U.S. at 651.

Contradicting the evidence CCMC presented to the district court,

the audio evidence of phone calls between Brenyah and Rebekah Smith, support that Brenyah made the contact to return to work, but Smith never returned her calls to be placed on the schedule. ROA.1597, 1619, 3562-79, 4560, 5630-33, 5636-40, Brenyah SJ Ex. 92 (Audio), Brenyah SJ Ex. 94 (Audio). Smith told Brenyah, "can I call you back" but Brenyah did not hear back from her. ROA.4560, 5638. *See Diflorio v. Kleckner*, No. 11-4405 (E.D. Pa.) (calls to employer with no response supported termination claim). CCMC's evidence contradicts the district court's findings raising a fact question on whether Brenyah was terminated by not being returned to the schedule.

### 4. **Constructive discharge.**

A constructive discharge occurs when an employee resigns due to intolerable conditions, making the resignation effectively involuntary. *Young v. Southwestern Sav. & Loan Ass'n*, 509 F.2d 140, 144 (5th Cir. 1975), *Jurgens v. EEOC*, 903 F.2d 386, 390 (5th Cir. 1990). The test is whether a reasonable employee would feel forced to resign, based on factors like demotion, pay or duty reduction, reassignment to degrading work or an unqualified supervisor, badgering, harassment, or humiliation, or less favorable terms of employment. *Brown v. Kinney*

*Shoe Corp.,* 237 F.3d 556, 566 (5th Cir.2001). Intent to force resignation is not required, but conditions must be more severe than a typical hostile work environment. *Jurgens*, 903 F.2d at 390, *Brown,* 237 F.3d at 566.

The district court found Brenyah faced "only mere harassment" and not constructive discharge. ROA.2770. However, Brenyah's March 21, 2018 letter tendering her forced termination detailed severe psychological harm, fear for her safety after security and police harassment, and lack of assurance retaliation would stop. ROA.1578, 3753–55, 5643–44. Brenyah also cited false accusations risking her license and being kept off the schedule. ROA.5643–44. She was replaced by Collado, a Filipina, CCMC's preferred race. ROA.5226–27. Unlike *Dornhecker*, 828 F.2d at 307, where the plaintiff quit immediately, Brenyah gave CCMC multiple chances to address the hostility and delayed her EEOC charge in hopes of staying employed. ROA.5643–44.

Ample evidence shows CCMC tried to force Brenyah out by ignoring escalating harassment, involving security and police to harass her, calling her "a nut," and mocking her as the "victim." ROA.1572, 2454, 4230–31, 5546–47, 5582, 5584, 5549–52, 5216. This, along with risks to her health, her and her patient's safety, and her career, led to her

constructive discharge. ROA.1573, 5643–44. Sewell and Rubano's failure to act, especially after the August 25 incident, reinforced her decision. ROA.1573, 1618, 4559, 5643-44. This irreparably damaged the employment relationship; no reasonable employee would return under threats to safety, their patient care, and risk professional licensing.

5. **Denial of medical care under CCMC's health insurance and harassment and removal by security and police from Doctors Regional were unlawful discrimination.**

The district court wrongly found that denial of care and security and police harassment on August 25, 2017, were not employment actions. ROA.2769. Health insurance is a job benefit. *Newport News*, 462 U.S. at 682. CCMC acted as both medical provider via its employee health insurance *and* employer.

On August 25, 2017, Brenyah went to Doctors Regional for physical therapy and pain management with her Black friend Nkem Hatter, an RN. ROA.1568, 1611, 2357, 2808. Hatter, who works for CHRISTUS Hospital, was going to work later. ROA. 2368, 2808. While waiting near Physical Therapy, two CCMC House Supervisors approached. ROA.1568, 1611, 2808. Annette Enriques asked if Brenyah was working, she responded she was on medical leave and needed therapy. Enriques said

therapy could not see her. ROA.1588-89, 1611, 2808. Brenyah said she would visit the Emergency Department (ED) for her injuries before leaving, and Enriques agreed. *Id.* Hatter stayed with their belongings. *Id.*

As Brenyah took the elevator to the ED, Espinoza and White security guard David LaVenture confronted her. ROA.1569, 1617, 2808, Brenyah SJ Ex. 53 (Video). Brenyah's declaration identifies photographs of herself, Conda, Espinoza, LaVenture, D.G. (another patient), Police Officer Johnson, Security Officer Lopez, Zamora, Hatter and Goodwine in CCMC's August 25, 2017 videos. ROA.1610-1617. Espinoza was Brenyah's supervisor. ROA.1569, 1836, 5478. LaVenture told Brenyah, "I was just told by the nursing staff and everybody that you need to leave the property and if you don't leave, I am going to call CCPD and have you removed." ROA.1569, 1617, Brenyah SJ Ex. 69 (Audio :04-:16). When she said she was going to the ED, he repeated the threat. Brenyah SJ Ex. 69 (Audio :34-:38). She asked why she was harassed and explained her need for treatment. Espinoza eventually let her proceed but followed her to the ED, and went first into the exam room before Brenyah could enter. *Id.*, Brenyah SJ Ex. 58 (Video :34).

When Brenyah entered the exam room, Espinoza had left. She told the medical staff she was having a panic attack from harassment by security and police threats. ROA.1569, 1618, Brenyah SJ Ex. 69- (Audio 4:02-6:30). Her pain worsened, but she was not evaluated for disability-related injuries despite her doctor's recommendation for x-rays. ROA.1569, 1618, 3488-3507, 4061-78, Brenyah SJ Ex. 69 (Audio 6:33-8:26). She was diagnosed with anxiety, her high blood pressure (176/90) and heart rate (110) showed physical effects of harassment, making discharge unsafe because uncontrolled blood pressure may cause a heart attack, blindness or stroke. ROA.1569, 1618, 3488-3507, 4061-78, 4558. LaVenture threatened to call police if she did not leave, though she never refused to leave. ROA.1569-70, 1580, 1618, 2420-2424, 4558-59, 5496-5500, Brenyah SJ Ex. 53-67 (Videos), Brenyah SJ Ex. 71 (Audio)., Brenyah SJ Ex. 60 (Video 8), Brenyah SJ Ex. 71 (Audio :28-:30). She requested stronger pain meds for her injuries, but CCMC prescribed Xanax for anxiety, which she could not fill due to pharmacy closure. ROA.1971-73, 2752.

Espinoza told Conda, "she is familiar with Brenda and Brenda has used the "harassment" word in other situations." ROA.1569-70, 1738,

5515. However, LaVenture reported, "Once Brenda was discharged from the ER, she refused to leave the hospital." ROA.1569, 1569-70, 5510, 5513. Hispanic security guard Daniel Lopez escorted CCPD and Brenyah to the second floor and said CCPD "helped make them leave" and "someone unknown had called [police] on her." *Id.* Espinoza instructed LaVenture to escort Brenyah off premises. ROA.1572, 5528. Espinoza wrote, "Later I received a call from David the security guard stating that Brenda refused to leave the hospital after being discharged from the ER and CCPD had to escort her out of the facility." ROA.1570, 5520. Security and police escorted Brenyah into the elevator, and Zamora, who received Brenyah's discrimination reports, rapidly joined them wearing a smile. ROA.1570, 1618, 4557, Brenyah SJ Ex. 64 (Video 12). The picture below shows Zamora entering the elevator with Brenyah, security and police. ROA.4557, Brenyah SJ Ex. 64 (Video 12), CCMC SJ Exhibits A-O (Videos):

Marissa Zamora:



D.G., a witness from the ED, spoke with Brenyah outside the hospital, "I saw that…that is terrible. It really wasn't necessary." She didn't like the White man's behavior. ROA.1571, 1618, 5531-44, Brenyah SJ Ex. 58 (Video 6, :00-2:00, 4:35-4:41, 9:44-9:54, 9:59-16:29, Brenyah SJ Ex. 59 (Video 7, :00-5:22), Brenyah SJ Ex.75 (Audio 2:45-5:50). A man interjected to say everything they were saying is being audio and video recorded by the hospital and "your [D.G's] son-in-law is in charge of this." ROA.1571, 5533-44, Brenyah SJ Ex. 75 (Audio, 5:48-7:12). D.G. agreed with Brenyah that she was not combative or raised her voice, she saw them yelling at Brenyah. *Id.,* ROA.5537.

LaVenture did not escort anyone else off the premises that day. ROA.1570, 2810, 5527. Contrary to CCMC's claims, several persons

*without wristbands* were not forced off the premises. ROA.1216, 1478,1570-71, Brenyah SJ Ex. 54 (Video 2 - persons walking, sitting), Brenyah SJ Ex. 58 (Video 6 - 14:10, woman standing next to security), Brenyah SJ Ex. 59 (Video 7 - 5:33-6:43, White woman spoke with LaVenture and went back into hospital), Brenyah SJ Ex. 61 (Video 9 - 0:40-1:11, walking hall), Brenyah SJ Ex. 63 (Video 11, people, including D.G., walking and sitting), Brenyah SJ Ex. 66 (Video 14, people walking, sitting, White man carrying food into elevator in front of security and police), Brenyah SJ Ex. 67 (Video 15, :00-:15 D.G., 1:00-1:20 man walking in front of Goodwine, 1:45-1:55 man walked by police). These comparable persons are not Black. *See Id.* This evidence was not analyzed by the district court in determining whether Brenyah suffered discrimination or retaliation.

Based upon Brenyah's observations, CCMC retained some video from August 25, 2017, but destroyed footage showing House Supervisors interactions with her on the second floor, her conversation with D.G. and Hatter, and parts of her movements. ROA.4451-4454. This is spoliation of evidence that should be considered in Brenyah's favor relevant to summary judgment.

The district court determined Brenyah did not show that the occurrences of August 25, 2017 affected the, "terms, conditions, or privileges of employment," as required to show an adverse employment action. ROA.2769. However, Brenyah did show the incident affected the terms and conditions of her employment. She cited her constructive discharge and, two weeks later, she was diagnosed with a disc herniation and ligament tear—injuries CCMC failed to diagnose or treat, causing unnecessary pain and delay. ROA.1572, 3540-41, 4111-12. Brenyah's harassment and removal from Doctors Regional on August 25, 2017, at the request of CCMC Management executed by CCMC security and police without cause shows unequal treatment affecting her access to health care which are employee benefits. Also, CCMC recorded these false accusations involving security and police in their records relevant to Brenyah thereby stigmatizing her and spreading a false, racially charged, and retaliatory narrative which could impact her nursing license. No evidence shows others were treated the same, and video, audio, and witness accounts support a jury question.

### 6. Additional facts supporting CCMC retaliated against Brenyah.

On July 1, 2017, Brenyah and Tyrell-Christi treated a patient with

Von Willebrand Disease (VWD), a bleeding disorder, who was bleeding heavily from a shaving cut because CNA Hernandez provided the patient with a shaving blade without telling Brenyah. ROA.1566–68, 3261-62, 4550. When Brenyah learned what happened, she quickly contacted the doctor, charge nurse, and house supervisor. *Id*. The patient later praised Brenyah's care. ROA.1609. On July 4, Brenyah emailed Sewell and Goodwine criticizing selective investigations, unequal treatment of Rivera and Martinez, and new, unfounded issues in her file. ROA.3192-94. Ex. 28. She also reported to Sewell and Zamora about medication errors relevant to her patients caused by others which impacted patient safety and Brenyah's nursing license. ROA.4551, Brenyah SJ Ex. 43 (Audio). There was no follow up. *Id*.

On August 10, 2017, Sewell issued Brenyah a disciplinary action alleging, "On 7/6/17 Brenda demonstrated a lack of care, an inability to prioritize or effectively care for a patient." ROA.3290. Significant evidence of pretext for this disciplinary action exists: 1) Sewell changed his position that the only reason Brenyah was written-up was because she was rude to that patient and for no other reason, and he wasn't concerned about the care that Ms. Brenyah had given. ROA.5220, 2)

Schmidt's report placed the "rude" actions on Tyrell Christi, ROA.3264-65, 3) the patient was crying because she thought she was bleeding to death. *Id*.; 4) the patient has VWD which Sewell never knew because he did not look at the medical records, ROA.5249, 5) Sewell did not discipline Tyrell-Christi, who had been coached for being rude to a patient, ROA.3230, 3245, 5253-54, 6) Sewell focused solely on Brenyah, ROA.3265, 7) Sewell did not advise Brenyah the patient claimed she was rude and never gave her a chance to respond, ROA.1609-10, ROA. 525, (Sewell could not remember); 8) Brenyah continued caring for the patient after the alleged incident and the patient was happy, ROA.1609, 4550, 3832-34, 9) Hernandez had been reported more than once for inappropriate behavior toward patients, but was only counseled, ROA.3934-7, 10) Sewell admitted the patient provided 2 different versions of what happened to Schmidt and him. ROA.5250, (11) this accusation was made shortly after the COO learned Brenyah filed an Ethics complaint, ROA.1567, 4651-52, (12) Within two weeks, Sewell told Brenyah that CCMC did not have light duty, but later admitted it was possible to place Brenyah on light duty. ROA.1620, 2285, 4561, 5245, 5403. These facts support pretext and retaliation, presenting a question

for the jury.

Brenyah endured other retaliation such as (1) Sewell and management refused her multiple requests to investigate and correct the discrimination and harassment, ROA.1573, 5643-44, (2) Lamond cut off her grievance process and calling her "a nut," and ridiculed her as the "victim" in an attempt to dissuade her opposition to discrimination, ROA.1572, 2454, 4230–31, 5546–47, 5582, 5584, 5549–52, 5216; (3) CCMC threated litigation to collect funds from Brenyah after her forced termination. ROA.5652.

Brenyah has presented detailed evidence that Sewell admitted he was not sure whether other nurses had their probation extended, later stating some had, though he could not identify them. ROA.5223–24, 5230. Goodwine cautioned that the move could appear retaliatory and required documentation, which Sewell did not have. ROA.1580, 5259. Goodwine also believed Brenyah might file an EEOC complaint with a co-worker. ROA.1565, 3203–04, 3774–75. On June 29, Sewell demoted Brenyah back to probation without explaining why he overrode her supervisor's authority. ROA.1565, 1579–80, 5242. Brenyah was treated less favorably than others. For example, Martinez completed probation

despite a patient fall hitting his head; Terell-Christi did so despite receiving 10 coachings; Casas and Martinez were not disciplined for time management issues, unlike Brenyah—who cared for high-risk patients with less support. ROA.1562–66, 4549–51, 3088, 3206–11, 5226, 5242, 3220, 3226–45, 3257–59.

The adverse actions to which Brenyah was subjected occurred immediately after her protected activity and were based upon pretext. *See Watkins v. Tregre*, 997 F.3d 275, 284 (5th Cir. 2021) (Prima facie case met based on six-to-seven-week gap between protected activity and termination.) Brenyah received her first coaching from Zamora just a day after reporting racial harassment on May 3. ROA.1603. The event which Zamora cited for the coaching occurred weeks earlier on April 18. Brenyah had resolved the issue during shift which is within protocol. ROA.1603-04, 4544-45. However, Brenyah saw Guerra, Hispanic, leave narcotic discrepancies undone for 3 days and Zamora did not say anything. *Id.*

On May 15, Zamora addressed NIH Stroke documentation, even though Brenyah complied with the 24-hour protocol. That same day, Zamora issued Brenyah a coaching despite her compliance. *Id.* Two

conflicting May 16, 2017 documents authored by Zamora reference time management issues—one with and one without an action plan. ROA.1604, 4545. However, Brenyah never received or was informed of either, nor was she told she had serious time issues. ROA.4545. Brenyah was assigned high-acuity patients without adequate support, requiring additional time. ROA.1562, 1556, 1604, 4131,4545. On May 17, Zamora accused Brenyah of patient abandonment, falsely alleging she went to the cafeteria. ROA.4545-046. Brenyah denied it, noting the cafeteria was closed and requested video review. Zamora ignored her response before issuing a coaching. *Id*. Non-Black nurses, including Rivera and Kenneth Go, Filipino, were not disciplined for patient abandonment for a significant period until Brenyah raised this issue to the EEOC. They were seen sleeping on duty, which is a nurse license violation under Texas law. ROA.1562, 1604-05, 4545-46. Rivera was photographed sleeping with a patient blanket. ROA.1605, 4546. Brenyah reported this to Zamora and Sewell, but no action was taken. *Id*. The cafeteria-related coaching was not produced in litigation. *Id*. When discussing Brenyah's probation, Sewell referenced the coaching, but did not provide a copy. *Id*.

Brenyah first saw several coaching documents during discovery,

including: (1) May 20, 2017: Accusation of failing to place a telemetry unit. However, medical records show no order existed at the time. ROA.3619-21, 3623, 4546. (2) May 23, 2017: Alleged failure to notify the charge nurse and to change a PICC line dressing. Medical records show Brenyah contacted the charge nurse, but was never informed of any PICC issue. ROA.3618, 4545-46, (3) June 15, 2017: Failure to perform a skin assessment. Brenyah took the photograph, but computer printer jammed. She needed to be able to print the photo in order that she could document with it the assessment that she performed. She spoke with the nurse who undertook the care of the patient after her and endorsed completing the assessment documentation to her. This is within protocol. ROA.4547, 3741, (4) June 20, 2017: An email from Rivera to Zamora and Sewell criticizing Brenyah's ability to print stickers which no one discussed with her. She learned of it only during discovery. ROA.3743, 4547, and (5) Around May 30, 2017: Brenyah was accused of not documenting skin, but she did. In this lawsuit, Brenyah saw that her entry had been altered and deleted. ROA.5039-41.

Throughout, Brenyah was denied the opportunity to respond to these issues while employed. Further, similarly situated non-Black

nurses were not held to the same standards. Although the trial court did not view the coachings as adverse actions, the coachings led to extended probation and the August 10 discipline—qualifying under *Pierce v. Texas Dep't of Criminal Justice*, 37 F.3d 1146, 1149 (5th Cir. 1994) as an adverse action. Like probation, performance improvement plans may deter protected activity. *Pollak v. Lew*, 2013 WL 1194848, at *9 (S.D. Tex. 2013), aff'd, 542 F. App'x 304 (5th Cir. 2013). Brenyah presents sufficient evidence of retaliation and pretext to survive summary judgment. Further, the district court erred by viewing the evidence in the light most favorable to the movant, CCMC, which violates the standards of summary judgment review. *Tolan,* 572 U.S. at 651.

### 7. Brenyah was discriminated and retaliated against by CCMC.

Brenyah met her prima facie cases for discrimination and retaliation as explained above. Also, she presented direct evidence of retaliation by Espinoza's comment made at the hospital referencing Brenyah's prior use of the word "harassment." ROA.1569-70, 1738, 5515. Then Espinoza proceeded on a mission directed at Brenyah including making false statements about her to justify harassment by security and police. The district court's order should be reversed and the case

remanded for trial and all other appropriate relief.

**III. CCMC discriminated and retaliated against Brenyah under 42 U.S.C. § 1981 while she was a patient trying to obtain medical care under her employer's health insurance.**

To establish a § 1981 claim for contractual discrimination, Brenyah must allege that (1) membership of a racial minority; (2) CCMC intended to discriminate on the basis of race; and (3) the discrimination concerned one or more of the activities enumerated in the statute — here, making a contract. *Body By Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F. 3d 381, 386 (citations omitted).  The analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims. *Id.* citing *Jones v. Robinson Prop. Grp. L.P.,* 427 F.3d 987, 992 (5th Cir. 2005), ROA.4049-60.

Relying on *Arguello v. Conoco, Inc.,* 330 F.3d 355, 358 (5th Cir. 2003), the district court found Brenyah did not show that she was prevented from obtaining service while at the hospital on August 25, 2017 because she was seen in the emergency room, given a prescription for medication, and materials regarding how to treat back pain. ROA.2771 Contrary to these findings, Brenyah was denied service. Merely providing medication for anxiety and materials on back pain did not rise

to a level of treatment. The entire interaction between Brenyah and the attending physician was audio recorded by Brenyah. Brenyah SJ Ex. 69 (Audio). Approximately 2 weeks later, when Brenyah was able to get medical care, she was diagnosed with a protrusion/herniation and ligament tear. ROA.3540-41.

Although Brenyah was admitted to Doctors Regional experiencing excruciating pain and leg numbness, Brenyah did not receive any treatment for her injuries on August 25, 2017. ROA.1568-69, 1618, 1752, 2715, 3488-3507, 4060-78, 4552. CCMC caused Brenyah to have a panic attack. The district court did not address in its analysis that Brenyah was harassed and escorted out by security and police unlike any other similar patient. *Id.*

### A. Brenyah's medical services as a patient from CCMC were a contract for purposes of 42 U.S.C. §1981.

Her employer-provided health insurance required that she receive physical therapy through a hospital affiliated with CCMC. ROA.2715, 4552, 5402-07.

### B. CCMC falsely portrayed Brenyah as rude and refusing to leave the hospital as a pretext to use security and police to harass her.

Almost immediately once she realized Brenyah's presence, Espinoza made false statements about Brenyah as justification to have security and police force her exit from the hospital. ROA.1569-70, 1738, 5515. No other patient was treated in this manner. *See* ROA.1569-71, 2810, 4060-78, 1836, 4552-59, 5448-62, Brenyah SJ Exhibits 53-67 (Video), 5718-33, CCMC SJ Exhibits A-O (Video), 5478, 5492, Brenyah SJ Ex. 69 (Audio), 5494, Brenyah SJ Ex. 71 (Audio), 5496-5505, 5527, 5531, Brenyah SJ Ex.75 (Audio), 5533-44, 5607-20.

## C. Brenyah was denied care for her injuries, later diagnosed as disc protrusion/herniation and ligament tear.

Brenyah did not receive *treatment* for her automobile injuries which was the reason she presented to the hospital. The district court relies on *Arguello* 330 F.3d at 358. However, *Arguello* involved a retail sales contract and that cite is relevant to that type of contract – not professional hospital services. *See Id.* at 360-61.

In *Abdallah v. Mesa Air Grp., Inc.*, 83 F.4th 1006, 1015 (5th Cir. 2023), the Fifth Circuit reversed summary judgment on race/national origin claims of two Arab men whose flight was canceled for fear they were terrorists. The Airline argued there was no §1981 claim because no

passenger travelled regardless of race. *Id.* The Fifth Circuit wrote, "The test is whether the outcome would be different but for the protected class: That can be shown by comparing the experience of the plaintiff to what his treatment would have been but for the protected class or by comparing the experience of the plaintiff to another individual without the protected class. If either leads to a different outcome, disparate treatment has occurred." *Id.*

A comparator was not necessary because of other evidence of discrimination. Brenyah presented evidence of disparate treatment and discrimination. Further, there is no evidence that anyone other than Brenyah and her African, Black friend, Hatter, were escorted off of the premises on August 25, 2017 by CCMC security and Corpus Christi police. This leaves a question for a jury to determine whether Brenyah was discriminated and/or retaliated against. *See* ROA.1569-71, 2810, 4060-78, 1836, 4552-59, 5448-62, Brenyah SJ Exhibits 53-67 (Video), 5718-33, CCMC SJ Exhibits A-O (Video), 5478, 5492, Brenyah SJ Ex. 69 (Audio), 5494, Brenyah SJ Ex. 71 (Audio), 5496-5505, 5527, 5531, Brenyah SJ Ex.75 (Audio), 5533-44, 5607-20.

### D. CCMC's harassment of Brenyah manifested itself by causing her elevated blood pressure heart rate and a panic attack.

CCMC caused health conditions suffered by Brenyah including anxiety, high blood pressure and a high heart rate. ROA.4060-78. CCMC discharged Brenyah despite the dangerously high blood pressure which may cause serious health consequences. ROA.4559.

### E. Direct evidence of retaliation.

There is direct evidence of retaliation when Espinoza told Conda, "she is familiar with Brenda and Brenda has used the "harassment" word in other situations." ROA.1569-70, 1738, 5515. Then Espinoza proceeded on a mission directed at Brenyah including making false statements about her to justify harassment by security and police and denying her care by entering the exam room prior to Brenyah.

A reasonable jury could find CCMC intentionally discriminated against Brenyah based on race. Therefore, the district court erred in granting summary judgment on Brenyah's §1981 claim. A plaintiff need not show a contract breach or comparators where other evidence shows discriminatory intent. The order of the district court should be reversed and a jury trial commence on this claim.

**IV.  A reasonable jury could find that CCMC violated Brenyah's rights under the Americans with Disabilities Act, as amended.**

The ADA defines a disability as: (A) a physical or mental impairment that substantially limits major life activities; (B) a record of such impairment; or (C) being regarded as having such an impairment. 42 U.S.C. § 12102(1). "Substantially limits" means limited compared to most people in the general population. 29 C.F.R. § 1630.2(j)(1)(ii).

To make a prima facie ADAAA claim, Brenyah must show: (1) a disability, (2) qualification for the nurse role, and (3) an adverse employment action because of her disability. *Equal Emp't Opportunity Comm'n v. LHC Grp., Inc.,* 773 F.3d 688, 697 (5th Cir. 2014). She had impairments—herniated disc and torn knee ligament—that substantially limited sleeping, walking, standing, lifting, and bending. ROA.4561, 3060-78, 4111-12, 4114-28. CCMC knew of her impairments and does not dispute her disability or qualifications. *Id.*

Section 503 of the ADA, 42 U.S.C. § 12203, provides: "(a) Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or

participated in any manner in an investigation, proceeding, or hearing under this chapter. (b) Interference, coercion, or intimidation.  It shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter."

Brenyah requested an accommodation of light duty from Sewell prior to her attempt to receive treatment from Doctors Regional.  He responded that there was no light duty.  Sewell knew that Brenyah was going to Doctors Regional for medical care.

### A. CCMC failed to engage in the interactive process and accommodate Brenyah's disabilities.

Brenyah submitted sufficient evidence she had a disability and she was qualified for the job. CCMC has not contested she has a disability. Once an employee makes a request, the employer is obligated to engage in an "interactive process"; "a meaningful dialogue with the employee to find the best means of accommodating that disability." *Tobin v. Liberty Mut. Ins. Co.,* 433 F.3d 100, 108 (1st Cir.2005).

When an employer does not engage in a good faith interactive process, that employer violates the ADA—including when the employer discharges the employee instead of considering the requested accommodations. *Cutrera v. Bd. of Supervisors of La. St. Univ.,* 429 F.3d 108, 113 (5th Cir.2005).

Brenyah was released for light duty and her employer was advised of this. ROA.5586. Sewell testified Brenyah may have been eligible for light duty depending upon her restrictions. ROA.1620, 2285, 4561, 5245, 5403. Goodwine testified that CCMC only offers light duty for work-related injuries. ROA.5297. This conflicts with other evidence, creating a fact issue. CCMC claims it met its ADA obligations by placing Brenyah on leave and it had no duty to provide light duty. But 29 C.F.R. § 1630.2(l)(1) prohibits forced leave as a substitute for accommodation. Employers must reassign disabled employees to equivalent vacant positions, regardless of whether the injury is work-related. See EEOC Enforcement Guidance.

Reassignment and policy modification are reasonable accommodations under the ADAAA unless they pose undue hardship. 29 C.F.R. § 1630.2(o)(2)(ii). Courts have held forced leave can violate the

ADAAA. *Lejuez v. Turner*, 2020 WL 6270747, at *4 n.3; *Dawson v. Akal Sec. Inc.*, 660 F. App'x 504, 506 (9th Cir. 2016). CCMC offered no evidence that providing light duty would cause undue hardship. *See Fisher v. Nissan*, 951 F.3d 409, 417 (6th Cir. 2020). It also failed to schedule Brenyah when she was cleared to return.

As for the district court's finding that Sewell's receipt of Brenyah's request for light duty was not sufficient to trigger a request for a reasonable accommodation, there is authority to support otherwise. See ROA.2867. *See Tobin,* 433 F.3d at 108. There is no evidence that despite Brenyah's request for an accommodation that Sewell took any action to see that the interactive process was achieved. As far as the district court's reliance on the third-party administrator, Sedgwick, to engage in the interactive process with Brenyah, that is not a valid defense. An employer or other covered entity cannot evade the obligations imposed by this part of the ADA by engaging in a contractual or other relationship. *See* Conference Report at 59; House Labor Report at 59–61; House Judiciary Report at 36–37. An employer cannot avoid its responsibility to make reasonable accommodation subject to the undue hardship limitation through a contractual arrangement. *Id.*

## B. CCMC interfered with Brenyah's medical care for her disabilities and retaliated against her.

The district court found that Brenyah has not properly pled a claim that CCMC interfered with her ability to receive medical care as a patient. In her complaint, Brenyah alleges that CCMC "engaged in unlawful employment practices in violation of Title I and Title V of the [ADA]." ROA.2780. The district court confuses Brenyah's pleadings by claiming Brenyah was required to plead a claim under Title III of the ADA. Brenyah pled a claim that CCMC interfered with her ability to receive medical care *because of her employment*, and in retaliation for her protected acts of reporting discrimination and seeking treatment for her disabilities, under Title I and Title V of the ADAAA. ROA.1017, 1034, Health insurance is a "fringe benefit" and term and condition of employment under Title I of the ADAAA. 42 U.S. Code § 12112 (b). Just as health insurance is covered relevant to Title VII as a "term and condition," so too is it covered under the ADAAA. The district court erred in its finding.

Brenyah pointed to evidence that other persons who were not employees, such as D.G., received treatment at the ED on August 25, 2017. D.G. was not similarly harassed by security and police and

escorted out like Brenyah. In fact, no other person was subjected to harassment like Brenyah. ROA.1216, 1478,1570-71, Brenyah SJ Ex. 54 (Video 2 - persons walking, sitting), Brenyah SJ Ex. 58 (Video 6 - 14:10, woman standing next to security), Brenyah SJ Ex. 59 (Video 7 - 5:33-6:43, woman spoke with LaVenture and went back into hospital), Brenyah SJ Ex. 61 (Video 9 - 0:40-1:11, walking hall), Brenyah SJ Ex. 63 (Video 11, people, including D.G., walking and sitting), Brenyah SJ Ex. 66 (Video 14, people walking, sitting, man carrying food into elevator in front of security and police), Brenyah SJ Ex. 67 (Video 15, :00-:15 D.G., 1:00-1:20 man walking in front of Goodwine, 1:45-1:55 man walked by police).

CCMC never raised an undue hardship defense, and clearly did not uphold the requirements of the ADAAA. The district court's order should be reversed on Brenyah's disability discrimination, harassment, interference and retaliation claims.

## V. The District Court Erred Relevant to Brenyah's Objections

The district court overruled Brenyah's objection based upon spoliation of video evidence of August 25, 2017. ROA.2866. Evidence supports CCMC's bad faith in not preserving video: (1) it anticipated video may be needed given Brenyah's allegation LaVenture was

harassing her and being racist; consciously allowing video to be deleted. ROA.2599-2601, 4551-54; and (2) Brenyah's testimony opposed Vesely's that relevant camera views were not saved. *Id.*, ROA.2637-2638, 2640-41, 4551-54. In *Van Winkle v. Rogers,* et al, No. 22-30638 (5th Cir. 2023), the Fifth Circuit found circumstantial evidence sufficient for a question of bad faith. *Id.* These facts support bad faith and give rise to a question of spoliation. Knowing Brenyah made a claim, CCMC allowed the destruction of relevant video. Brenyah's objection should be sustained and the question presented to a jury.  ROA.2796

The district court overruled Brenyah's objection to CCMC's Exhibit LL, D.E. 104-39. Brenyah's objection lodged in the motion should be sustained because Exhibit LL is contradicted by competent summary judgment evidence. *Cruz v. Aramark Services, Inc.,* 213 Fed.Appx. 329 (5th Cir.2007). If the Court finds it admissible, it is not binding on the court and is to be given no more weight than any other testimony. *Smith v. Universal Services, Inc.,* 454 F.2d 154, 157 (5th Cir. 1972). ROA.2796. This is also objectionable because it is not a final determination and not adopted officially the EEOC.  As well, it contradicts case law.

## VI. Issues the District Court Did Not Address.

Because summary judgment was recommended on all claims, the order did not reach CCMC's exhaustion or mitigation arguments. ROA.2785. Brenyah addresses them to preserve the issues.

### A. There Is Sufficient Evidence to Raise a Genuine Dispute of Material Fact to Show Brenyah Exhausted Administrative Remedies as to her EEOC Charge

Brenyah's EEOC charge filed on February 12, 2019, was timely under the EEOC's extended deadline due to the government shutdown from December 22, 2018, to January 25, 2019. ROA.5654. The EEOC confirmed deadlines between December 22, 2018 and January 29, 2019, were extended to February 12, 2019. Brenyah complied with these instructions. ROA.1620, 4561.

Even if timeliness is questioned, the 300-day deadline is subject to equitable tolling or estoppel where a plaintiff is misled or prevented from asserting rights. *See Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999); *Wilson v. Sec'y, Dep't of Veterans Affairs*, 65 F.3d 402, 404 (5th Cir. 1995). The EEOC accepted and investigated the charge, and Brenyah timely received and acted on the Notices of Right to Sue. ROA.5656-69. CCMC's argument that this claim is untimely should be rejected. Section

1981 does not require administrative exhaustion. Brenyah's claims covered in the second EEOC charge are timely under § 1981.

## B. Brenyah did not fail to mitigate damages.

CCMC claimed Brenyah failed to mitigate damages by not seeking work diligently. ROA.1240. However, she was severely traumatized by her experience, fearing for her nurse license due to false accusations. ROA.4772. She regularly applied for jobs, interviewed, and contacted staffing agencies. ROA.4772–4787. One interview with an HCA recruiter became uncomfortable when she described her constructive discharge and police involvement at CCMC. ROA.4772–4787. She also sought counseling for anxiety and fear of returning to work, citing racial discrimination fear of it happening again. ROA.4181–4182, 4185.

Unable to find work, Brenyah's situation worsened—she lived in poor conditions, sometimes in her car, and lost important documents in a storage incident. ROA.1619–20, 4560–61. She suffered emotional, reputational, and financial harm, losing back pay from both her constructive discharge and denial of light duty. From Nov. 25, 2017, to Jan. 7, 2018, she lost $11,641.36 in wages, with total losses now around $600,000. She provided work search records. *Id.*, ROA.5681–95. Police

involvement at Doctors Regional further hindered her job search, as she had to disclose it, which deterred employers. ROA.1619, 4560.

Back pay is not cut off if discrimination caused the inability to work. *Johnson v. Spencer Press*, 364 F.3d 368, 383–84 (1st Cir. 2004). Doubt is resolved in the victim's favor. *Pettway v. Am. Cast Iron Pipe Co.*, 494 F.2d 211, 260–61 (5th Cir. 1974). Brenyah offered testimony and evidence that CCMC's actions disabled her. As CCMC seeks summary judgment on mitigation, it bears the heavy burden of proof. *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). Denying back pay here would undermine Title VII's purpose. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975).  Any relief for CCMC on this issue should be denied.

## C. Bill of Costs Should be Resolved in Favor of Brenyah.

A Bill of Costs was issued in this case based upon the final judgment of the district court. ROA.2875., 2905-3030. Brenyah filed objections. *Id*. CCMC responded. ROA.3036-37. There has been no ruling on the objections. Brenyah requests the Bill of Costs be struck if Brenyah succeeds on this appeal rather than requiring a separate appeal.

# V. CONCLUSION

Brenyah has shown that a jury may reasonably conclude that she has presented viable claims of employment discrimination, hostile work environment, and retaliation claims under Title VII, 42 U.S.C. § 1981, and the ADAAA. The evidence supports that Brenyah is entitled to the benefits of these laws including the opportunity to have a jury trial on the merits of her case. This case should be reversed and remanded for appropriate proceedings including a jury trial with the bill of costs to be struck.

Respectfully submitted,

/s/ Gay E. Gilson
Gay E. Gilson
State Bar No. 00784131/Fed I.D. 16385
Law Offices of Gay E. Gilson
5525 S. Staples, Suite B3
Corpus Christi, Texas 78411
Tel:(361) 887-0552/Fax: (361) 887-0554
Email: gegilson@gilsonlaw.com
Counsel for Appellant, Brenda Brenyah

## CERTIFICATE OF SERVICE

On June 16, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of a commercial virus scanning program and is free of viruses.

<u>/s/ Gay E. Gilson</u>
Gay E. Gilson

**CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because this brief contains 12,255 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word, Century Schoolbook, 14-point font.

<u>/s/ Gay E. Gilson</u>
Gay E. Gilson